**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION**

**ANDREA GRUMMER, Individually and as
Surviving Spouse, Executor, and Personal
Representative of the ESTATE OF GERALD
ANTON GRUMMER, Deceased**                                    **PLAINTIFF**

**V.**                                    **CASE NO. 5:22-CV-5177**

**BUDGET TRUCK RENTAL, LLC;
and COVEY RENTALS, LLC**                                    **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case arises from a tragic incident in which a moving truck rolled down a hill with its driver door open, collided with a tree, crushed Plaintiff's husband, Gerald Grummer, between the driver-side door and the cabin, and killed him. The Court now takes up five ripe motions. For the reasons discussed in this Order:

- Defendants' Motion to Exclude and/or Limit Expert Testimony of Dr. Dennis Seal (Doc. 40) is **GRANTED IN PART AND DENIED IN PART**;

- Defendants' Motion to Exclude and/or Limit Expert Testimony of Pete Sullivan (Doc. 41) is **GRANTED IN PART AND DENIED IN PART**;

- Plaintiff's Motion to Strike Defendants' Summary Judgment Evidence (Doc. 42) is **DENIED**;

- Defendants' Motion for Partial Summary Judgment (Doc. 37) is **GRANTED IN PART AND DENIED IN PART**; and

- Plaintiff's Motion for Spoliation Sanctions (Doc. 53) is **DENIED**.

## I. BACKGROUND

The following facts are undisputed unless otherwise noted. On July 22, 2022, Conner Grummer, son of Gerald and Andrea Grummer ("Mr. Grummer" and "Mrs. Grummer," respectively), rented a Budget moving truck from Covey Rentals for his move

from Colorado to Arkansas. His brother, Jordan Grummer, accompanied him to pick up the truck. The brothers returned to Conner's house to load the truck for Conner's move. The following morning, Jordan began the drive from Colorado to Arkansas in the truck, while Conner followed in his own car. The two brothers eventually arrived at Conner's friend's house in Fayetteville, Arkansas. At this time, Jordan left to return to his home in Texas, and Conner stayed with his friend. At some point during Conner's stay, his friend moved the truck to a different spot on the property, where it remained until the accident. On the morning of July 25, Mrs. and Mr. Grummer arrived to help their son complete his move to Bentonville, Arkansas. Mrs. Grummer and Conner were each to drive their own cars, and Mr. Grummer planned to drive the moving truck.

Mrs. Grummer and Conner both got into their cars to drive away, while Mr. Grummer got into the Budget truck. Mrs. Grummer noticed that Mr. Grummer was taking a while to get the truck moving. She looked through her rearview mirror to see what was delaying him, at which point she saw him exit the truck and bend down to look inside it. The truck then began rolling down the hill with its driver-side door open. Mr. Grummer ran after the truck to try and stop it.[1] Mrs. Grummer saw the truck collide with the tree, and Conner heard the crash. They both went over to see what happened and found Mr. Grummer pinned between the open driver-side door and the B-pillar of the truck's cabin; the truck was crushing him.

---

[1] Plaintiff's Statement of Disputed Facts (Doc. 45) disputes Mrs. Grummer's narration of events on the technicality that the question eliciting this testimony at deposition was vague and called for speculation. However, Plaintiff does not challenge the substance of her own testimony that she personally observed this, and she affirmatively states in her Statement of Facts that she saw him exit the truck and run after it. (Doc. 45, p. 14). Thus, the Court considers the facts above to be undisputed.

Mrs. Grummer reached through the broken driver-side window to unlock the truck, which allowed Conner to climb in through the passenger side to try and put the truck into reverse and free his dad. Conner was unable to do so and claims that he struggled to get the gear shift into reverse. When the EMTs arrived, one of them climbed into the truck and attempted to reverse it but was unable to. Ultimately, the fire department had to hook a winch onto the back of the truck. Captain Anthony Harder got into the truck, released the parking brake, and put the truck in neutral, at which point the fire department was able to move it back from the tree and release Mr. Grummer.

Mr. Grummer was declared dead at the scene. However, Mrs. Grummer and Conner have testified that Mr. Grummer was not dead upon initial impact. Mrs. Grummer testified in her deposition that she had struggled to find where to unlock the truck on the driver's side, and Mr. Grummer "reached up and pointed for [her] to unlock it." (Doc. 60-1, p. 35). Conner testified that, while he did not see any signs that his dad was conscious once he climbed into the vehicle, he did see him breathing. (Doc. 38-5, p. 12).

The primary issues in this case revolve around the truck's gear shift and its check engine light ("CEL"), which was undisputedly illuminated at the time Conner rented the truck and following the accident.

Plaintiff contends that the gear shift in the Budget truck was loose to a degree that interfered with a driver's ability to reliably shift into the desired gear, and that Defendants knew or should have known of this malfunction. Specifically, Plaintiff argues that the confusing state of the loose gear shift prevented Conner and the EMT from reversing the truck and releasing Mr. Grummer. Jordan Grummer claims that he first noticed the loose gear shift while still in the Covey parking lot, and that he continued to experience it while

using the truck. (Doc. 44-10, p. 5). When he tried to put it into gear, it would "fall below" the intended gear and he would have to "delicately" and "slowly move it to make sure it would stay." *Id.* at pp. 6 & 8. Jordan testified that he did not experience problems with the gear shift once it was actually in position, and he did not tell anyone of this problem until after the accident. *Id.* Conner also experienced difficulty getting the truck to reverse when he was attempting to free his father. *See* Doc. 44-32, p. 10. Shortly after the accident, Mrs. Grummer's brother, Brian Blackstone, videoed himself manipulating the gear shift and stated in an unsworn declaration that "[t]he gear shifter moved through various settings with little to no resistance." (Doc. 44-12, p. 2); *see also* Doc. 45-11 (video file). Additionally, Plaintiff cites expert Pete Sullivan and his colleague's video to show the gear shift's excessive looseness. (Doc. 44-13, pp. 8–17; Doc. 44-14, p. 48; Doc. 44-17 (video file)).

Defendants contest that the gear shift was unreasonably loose or that there was any way for them to have known if it was. The forms from the July 18, 2022 10-point inspection and the July 22, 2022 Walk-Around Inspection—which was conducted with Conner on the day of the rental—do not indicate any issue with the gear shift. *See* Docs. 44-6, 45-17, 38-3. Neither of these inspections specifically tested the functioning of the gear shift. However, Neil Covey testified in his deposition that, on the day of the rental, he drove the truck approximately 100 feet, and the gear shift was not loose. *See* Doc. 44-7, p. 28. Defendants' experts stated that, while the gear shift was slightly loose, they did not see it as a concern. *See* Doc. 44-16, p. 8; Doc. 44-18, pp. 16–17.

The second major dispute has to do with the CEL. It is undisputed that the CEL was illuminated when the truck was rented to Conner Grummer. (Docs. 44-11 & 44-7, p.

24). It is also undisputed that Budget had a practice of installing aftermarket catalytic converters in their trucks, causing the CEL to illuminate nearly constantly, and that the subject truck had an aftermarket catalytic converter installed mid-2021. (Doc. 38-1, p. 2). The parties, however, dispute what caused the CEL to illuminate in this specific instance and whether appropriate maintenance and inspection was conducted on the truck in this case.

Defendants contend that the illuminated CEL in this case was due only to the installation of the aftermarket catalytic converter and, therefore, posed no safety risk. Defendants base this contention on two separate facts. First, it was Covey's consistent practice to send any truck with an illuminated CEL to Budget's on-site maintenance staff and only rent such trucks with Budget's permission. *See* Doc. 44-7, pp. 24–25, 28; *see also* Doc. 44-8, pp. 14–15 (Budget's on-site fleet service manager stating that it was highly likely the truck was inspected to diagnose the CEL). Second, Defendants cite the fact that their expert's diagnostic test of the subject truck in November 2022 showed that the only active codes (meaning present at the time of inspection) were related to the catalytic converter. (Doc. 38-11, p. 12). Defendants' expert, Adam Michener, further opined that the historical codes were not related to the subject incident. *See id.*; Doc. 44-18, pp. 8–9.

Plaintiff argues that because Budget frequently installed aftermarket catalytic converters in its trucks, thus triggering the CEL in many trucks, Defendants became complacent to the CEL and did not take proper precautions to ensure there were no undetected safety issues prior to each rental. Plaintiff cites the absence of maintenance or inspection records for the subject truck between July 18 and July 22, 2022, as

suggesting that there were no diagnostics run to determine the cause of the CEL prior to renting the truck to Conner. *See* Doc. 44-8, pp. 15–17 (Budget's on-site fleet manager, Tim Miller, stating that, despite him and a mechanic tech looking for record of inspection or diagnostics during this time, no record was found; also noting that records of work performed were generally, but not always, made). *But see id.* at p. 19 (Mr. Miller stating that after diagnosing a CEL he would verbally communicate the diagnosis to the Coveys rather than writing it down). Additionally, Plaintiff flags the fact that the Walk-Around Inspection form given to Conner did not include any notation of the CEL, (Doc. 45-17), but Covey's copy did (Doc. 38-3). The parties dispute whether Covey added the CEL notation after finding out about the accident or whether the carbon copy merely failed to capture this notation.

Plaintiff's theory is that the CEL was due—at least in part—to an "overspeed" condition. In support of this theory, Plaintiff cites the trouble Jordan had with the engine overturning/overrevving during his drive, (Doc. 38-9, p. 8); the historical codes at the November 2022 diagnostics, including ones for vehicle and engine overspeed condition, (Doc. 44-18, pp. 8–9); and Plaintiff's expert's opinion that, had the subject truck been in drive with the parking brake engaged at the time of the incident, an overspeed condition could have caused the truck to overcome the parking brake and go into an "uncontrolled, likely powered roll away." (Doc. 44-14, pp. 53, 62; Doc. 38-8, pp. 21, 23). Plaintiff contends that these historical codes could have existed at the time of the July 2022 accident, but that the codes were moved from "active" to "historic" due to Budget's failure to preserve the truck's condition. *See* Doc. 44-18, pp. 8–10 (Defendants' expert explaining that historic codes have no timestamp, so they cannot identify when these malfunctions last

occurred); Docs. 53, p. 6 & 61-1, p. 10 (both parties state that the truck had an additional 167 miles on it between the time of the accident and the inspection).

Lastly, but material to the present Motions, Defendants' evidence shows that there was regular maintenance performed on this truck. *See* Doc. 38-1 (maintenance log for this specific truck); Docs. 60-9 & 60-11 (work order details corresponding to the log); Doc. 38-2 (showing that the truck's preventative maintenance and annual inspection were up to date). Though Plaintiff challenges the thoroughness of this evidence, Plaintiff has not met proof with proof to actually raise an issue of fact that this evidence does not accurately reflect this truck's maintenance.

On August 30, 2022, Plaintiff brought this suit on behalf of herself and her husband's estate, pleading the torts of outrage and negligence (including under a theory of *res ipsa loquitor*), a survivorship claim under Arkansas Code § 16-62-101, wrongful death under Arkansas Code § 16-62-102, and requesting punitive damages (for gross negligence and outrage). *See* Doc. 2. Defendants filed *Daubert* motions to exclude or limit the testimony of two of Plaintiff's experts—Dr. Dennis Seal and Pete Sullivan—and also moved for partial summary judgment on outrage, gross negligence, punitive damages, and *res ipsa*. In turn, Plaintiff moved to strike nearly all of Defendants' summary judgment evidence and asked the Court to impose adverse inference injury instructions against Budget as a spoliation sanction. This case is set for trial on March 18, 2024.

## II.  DEFENDANTS' *DAUBERT* MOTIONS

### A.  Legal Standard

The decision whether to exclude expert testimony is committed to a district court's discretion—subject, of course, to the Federal Rules of Evidence, including Rule 702. *Johnson v. Mead Johnson & Co., LLC*, 754 F.3d 557, 561 (2014).  Rule 702 states that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

The Eighth Circuit has "boiled down" these requirements into a three-part test:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact.  This is the basic rule of relevancy.  Second, the proposed witness must be qualified to assist the finder of fact.  Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires.

*Johnson*, 754 F.3d at 561 (quoting *Polski v. Quigley Corp.*, 538 F.3d 836, 839 (8th Cir. 2008)).  The proponent of expert testimony bears the burden of showing by a preponderance of the evidence that these requirements are satisfied.  *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757–58 (8th Cir. 2006).

A district court possesses broad discretion in making its reliability determination. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999).  When assessing the validity of expert opinions, the trial court may consider one or more of the following non-exclusive factors: (1) whether the theory or methodology can be tested; (2) whether the theory or methodology has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has been generally accepted in the

8

relevant scientific community. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993). "An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 702. However, "[e]xpert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis." *J.B. Hunt Transp., Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001) (internal citations omitted).

"A witness can be qualified as an expert by knowledge, skill, experience, training or education . . . ." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 715 (8th Cir. 2001) (internal quotations omitted). And "[t]he relative skill or knowledge of an expert goes to the weight of that witness's testimony, not its admissibility." *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 569 (8th Cir. 1988). "[I]t is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in [a] case." *Wheeling Pittsburg Steel Corp.*, 254 F.3d at 715.

To prove useful to a jury, an expert's opinion should rely on their specialized knowledge; "[w]here the subject matter is within the knowledge or experience of lay people, expert testimony is superfluous." *Ellis v. Miller Oil Purchasing Co.*, 738 F.2d 269, 270 (8th Cir. 1984). Further, an expert should not make unsupported assertions that go beyond their area of expertise. *See Anderson v. Raymond Corp.*, 340 F.3d 520, 523 (8th Cir. 2003) (finding the district court did not abuse its discretion where it prohibited an expert from testifying on matters admittedly beyond his expertise). To that end, an expert should not opine on legal conclusions, as these will not assist the jury either. *Peterson v.*

*City of Plymouth*, 60 F.3d 469, 475 (8th Cir.1995) ("The legal conclusions were for the court to make. It was an abuse of discretion to allow the testimony.").

## B.  Dr. Dennis Seal

Dr. Dennis Seal is an expert in human factors—a "recognized discipline of applied engineering that is focused on the way humans interact with machines and function-driven technology." (Doc. 48-3, pp. 2–3). Experts in this field "use psychological science to guide the engineering of products, systems, and devices, with a focus on performance, risk, mitigation, and personal safety." *Id.* at p. 3. Defendants do not contest Dr. Seal's qualifications, and the Court's review of his report and CV confirm that he is sufficiently qualified to testify in this area.

Dr. Seal's opinion centers around the confusion that an operator of the truck would experience upon encountering the combination of "confusing, unclear, or unpredictable tactile stimulus [the loose gear shift,] visual gear selection [due to the loose gear shift,] and an illuminated [CEL]." (Doc. 48-3, p. 7).[2] Dr. Seal bases his opinions on his review of the evidence and filings in this case, including pictures and videos of the truck (notably all videos were taken after the incident), review of relevant literature, and Plaintiff's attorneys' recounting of interviews with Mrs. Grummer and Conner.[3] Dr. Seal has not

---

[2] The Court's analysis of Dr. Seal's opinion comes from his expert report (Doc. 40-2), affidavit (Doc. 48-3, pp. 1–8), supplemental report (Doc. 48-3, pp. 10–21), and deposition (Doc. 40-3). While Dr. Seal's report and deposition speculate that Mr. Grummer in fact was confused because he (in fact) saw, thought, or felt particular things, his affidavit clarifies that his opinion is meant to focus on what users of the vehicle (including Mr. Grummer, Conner, and the EMT) *likely experienced* based on certain conditions and Dr. Seal's expertise in human factors (particularly as it relates to people's response to visual and tactile stimuli).

[3] As a basic threshold observation, the Court has concerns as to the reliability of Dr. Seal's opinions due to his comfort in adopting Plaintiff's counsel's theory of the case (supposedly

inspected or visited the subject truck or scene of the incident in person, nor has he run any diagnostics on the truck.  In this regard, Dr. Seal admitted that he is not an expert in diagnostic or mechanical testing of trucks like the one in question, (Doc. 40-3, pp.10, 22); he is not an accident reconstructionist, *id.* at p. 1; and he does not intend to offer any design defect opinions as to the instrument panel on the truck's dashboard, *id.* at p. 15.

Defendants now seek to exclude Dr. Seal's testimony in whole or in part. They challenge his opinion by arguing the following: (1) his opinions are "conclusory, devoid of analytical support, and not tied to any applicable methodology"; (2) his opinions on the cause of the CEL and the condition of the gear shift are "[o]utside [h]is [a]rea of [e]xpertise and [l]ack [e]vidence"; (3) his opinions on the condition of the truck at the time of the accident and Mr. Grummer's experience during the incident are "[s]peculative" and "unsupported by the evidence"; (4) his opinions regarding what Mr. Grummer must have observed or done during the incident and Dr. Seal's assessment of the condition of the gear shift are "[b]ased on [c]ommon [k]nowledge" and unhelpful to the jury; and (5) Dr.

---

premised on the attorneys' witness interviews), rather than the undisputed facts in the sworn depositions. *See* Doc. 40-3, pp. 11–12 (Dr. Seal's deposition transcript). Even where Dr. Seal conceded obvious factual discrepancies during his deposition, he left those factual errors in his supplemental report submitted a month after his deposition. For example, Dr. Seal apparently continues to believe that *Conner* noticed lash in the gear shift during his driving of the truck from Colorado to Arkansas (Doc. 48-3, pp. 12–14).  Yet in his deposition, Dr. Seal readily conceded that it was Conner's brother, Jordan, who drove the truck to Arkansas. (Doc. 40-3, p. 9).  And according to Dr. Seal's January 9, 2024 supplemental report, Conner witnessed his father's actions on the morning in question from starting the truck, to setting the brake, to getting out of the truck, to following alongside the truck before it struck the tree. (Doc. 48-3, p. 13) ("This series of events was witnessed by Conner . . . .").  But during his December 14, 2023 deposition, Dr. Seal conceded that Conner did not see what happened before the crash—only Mrs. Grummer did. (Doc. 40-3, p. 14).  Dr. Seal's reports are replete with similar errors of undisputed fact. While such errors are likely innocent and careless ones, they do not inspire confidence as to Dr. Seal's ability or willingness to reliably apply his expertise to the actual facts of the case.

Seal should not be permitted to offer new opinions outside his report, specifically as it relates to the parking brake indicator. *See* Doc. 40-1.

The Court finds that human factors engineering is a recognized applied science at the intersection of psychology and human interface with machines. The Court also recognizes that Dr. Seal is qualified by his education and experience to offer expert opinions within this scientific arena generally, and vehicle dashboard symbols and warnings more specifically. That said, both the human factors field and Dr. Seal's experience are primarily focused on how to best *design* machines to account for human factors and ergonomics. Here, Dr. Seal has not been asked to—and does not intend to— offer any opinions on design defects. So, the Court must analyze Dr. Seal's role in the overall proof and assess how his opinions might help the jury "to understand the evidence or determine a fact in issue" in the case at bar.  Fed. R. Evid. Rule 702(a).

In sorting through what Dr. Seal may and may not testify to, the Court has set aside the issue of whether Dr. Seal's opinions are ultimately a correct conclusion from his application of human factors principles and standards to the facts in this case, as that is not part of the reliability inquiry. *See Daubert*, 509 U.S. at 595. ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.").  Rather, the Court's concern is that Dr. Seal's conclusions are, in some instances, beyond the scope of his expertise; and in other instances, nothing more than *ipse dixit*—his own subjective interpretation of what Mr. Grummer must have thought or done. The Court will not permit either variety. The following discussion will begin with

topics and opinions that the Court will not allow, followed by a description of permissible topics and opinions.

Certain aspects of Dr. Seal's opinions go beyond his demonstrated expertise and are unreliable and unhelpful. *See Anderson*, 340 F.3d at 523. For example, there are instances where he opines as to the mechanical, diagnostic, and engineering causes of the alleged malfunctions—namely the illuminated CEL, the loose gear shift, and the dual gear indicator. *See, e.g.*, Doc. 40-3, p. 24 ("I would say that it's more likely than not that [the CEL] was [related to] a transmission issue."). Such testimony is admittedly outside the scope of his expertise in human factors and, thus, is not reliable or helpful. *See id.* ("I don't know. I didn't perform any diagnostics on this particular vehicle."); Doc. 48-3, p. 7 ("I offer no mechanical, diagnostic, or engineering opinions regarding the underlying fault of the cause" of the CEL or loose gear shift.). Dr. Seal may not testify or opine on these matters.

Dr. Seal's testimony as to whether the gear shift is classified as "loose" is similarly not grounded in his expertise in human factors but instead seems to be his personal interpretation of the videos he was provided. While Dr. Seal's human factors expertise may be useful in helping the jury understand a *person's response* to a gear shift behaving the way this one does in the video, his mechanical assessment of the gear shift's functionality is not reliable or relevant.[4]

Further, Dr. Seal's testimony may not creep into speculation about what Mr. Grummer—or any other person—*actually* saw, observed, thought, or did absent sufficient

---

[4] The Court notes that other experts in this case have both reliable and relevant opinions regarding the condition of the gear shift. The distinction lies in the expert's area of expertise.

factual support. "Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis." *J.B. Hunt Transp.*, 243 F.3d at 444 (internal quotations omitted). Dr. Seal's report, supplemental report, and deposition include extensive narration purporting to reconstruct what Mr. Grummer saw, observed, thought, etc. immediately prior to the incident.  The narratives in his reports include facts that are demonstrably wrong and conclusions that amount to nothing more than *ipse dixit*. Dr. Seal's affidavit provides some reassurance that he understands the appropriate boundaries of his testimony here. *See, e.g.*, Doc. 48-3, p. 5 ("There certainly are many things about the sequence of events on the date in question that we don't know.  Among those, we don't know whether Mr. Grummer actually observed the displayed malfunction indicator light . . . ."). To be clear, the Court will not permit Dr. Seal to reconstruct what Mr. Grummer did or thought on that fateful morning.

In a similar vein, it is neither reliable nor relevant for Dr. Seal to opine as to the actual conditions that existed in the truck immediately prior to and during the incident. Plaintiff has not shown how such testimony would amount to anything more than Dr. Seal's personal weighing of the facts, rather than the application of his expertise to the facts, which is not sufficient for Rule 702. "For purposes of [his] testimony," Dr. Seal "may only 'assume'" that certain conditions existed (if there is a factual predicate in the record); he may not assert that they in fact did exist to any degree of certainty. *Berg v. Johnson & Johnson*, 940 F. Supp. 2d 983, 1001 (D.S.D. 2013).

Finally, Dr. Seal will not be allowed to offer a "new" opinion about whether the "brake indicator light provid[ed] misinformation" because it involves his subjective reconstruction of the meaning of EMT Samantha Scott's affidavit. *See* Doc. 40-3, pp. 27–

14

28. This "opinion" is not based on sufficient facts and is not a reliable application of Dr. Seal's expertise to those facts. Further, under Federal Rule of Civil Procedure 26(a)(2)(B)(i), an expert's written report must include "a complete statement of all opinions the witness will express and the basis and reasons for them." And under Rule 37(c)(1), a party that "fails to provide information . . . as required by Rule 26(a) . . . is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial." *See also* Fed. R. Civ. P. 37(c)(1)(C) (permitting sanctions under Rule 37(b)(2)(A)(II), which allows the district court to "prohibit[ ] the disobedient party . . . from introducing designated matters in evidence"); *see also, e.g., Isham v. Booneville Cmty. Hosp.*, 2015 WL 11117161, at *1 (W.D. Ark. July 6, 2015) (applying Rules 26(a)(2)(B)(i) and 37(c)(1)(C)).

So, what does that leave for Dr. Seal to testify about? To the extent it is included in his expert report, he may discuss human factors standards for the relevant visual and tactile stimuli in this case and how they apply to the facts in this case, including whether such stimuli could have potentially caused confusion. *See* Doc. 40-2, p. 12 (discussing tactile feedback of the gear shift and accurate visual feedback of gear positions); Doc. 48-3, pp. 4–5 (explaining that the CEL is intentionally placed to maximize the possibility that a user will see it and why gear shifts provide tactile feedback); *id.* at pp. 3, 4, 6 (explaining the Stimulus/Process/Response framework); *id.* at p. 7 (further discussing how the combination of the CEL, loose gear shift, and dual gear indicator may cause confusion to the operator). He may also opine as to the degree and type of risk these alleged malfunctions may cause, alone and in combination. *See* Doc. 40-2, p. 11 ("The reported faulty conditions presented the driver with an unacceptable likelihood or

occurrence as well as high severity of risk."). The Court retains discretion at trial to further limit Dr. Seal's testimony should it go beyond the bounds of admissibility.

To be clear, Dr. Seal can't speculate about the existence or cause of any particular vehicle condition prior to or after the accident, but he may rely on the record evidence of other witnesses with personal knowledge and the opinions of other testifying experts in forming his own human factors opinions.  And when discussing driver confusion, this must be from the perspective of the generic driver anticipated under the human factors standards—not what or how Mr. Grummer or any specific person would have actually thought or reacted.

Accordingly, the Court **GRANTS** Defendants' request to limit Dr. Seal's testimony but **DENIES** Defendants' request to exclude his testimony in whole. Dr. Seal's testimony will be permitted subject to the parameters discussed *supra*.

### C.  Pete Sullivan

Pete Sullivan is Plaintiff's designated expert in vehicle maintenance, vehicle systems testing and analysis, transportation safety, and digital forensics. The Court's review of his credentials and experience confirms that he is a qualified expert in this area, and Defendants do not dispute his qualifications.

Mr. Sullivan's report, supplemental report, affidavit, and deposition include opinions on the condition and causes of the CEL, the loose gear shift, and a potentially defective parking brake indicator; opinions on industry standards of rental companies; and opinions on Budget's spoilation of the evidence and potential violations of the Clean Air Act. Mr. Sullivan bases his opinions on his review of the evidence and filings in this case, along with relevant guidelines, manuals, and literature. He also obtained and

reviewed scans, diagnostic information, pictures, and videos of the subject truck from a long-term colleague and used them to develop his opinion in this case.

Defendants ask the Court to exclude or limit Mr. Sullivan's testimony in part or in whole for the following reasons: (1) he has no reliable methodology and did not inspect or run tests on the scene or vehicle; (2) his opinion on spoilation is a legal conclusion that is not based on sufficient facts; and (3) his opinion on the Clean Air Act is an impermissible instruction on the law. *See* Doc. 41-1.

Defendants attack Mr. Sullivan's opinion as unreliable because he did not conduct tests or inspections of the accident scene or vehicle. But, as Mr. Sullivan clarified in his deposition—and Plaintiff points out in her Response—Mr. Sullivan's field technician, Wayne Burkett, a thirty-year employee, did inspect the subject vehicle. Mr. Burkett's inspection was jointly conducted with defense experts—together they took scans, pictures, video, and ran diagnostics. Mr. Sullivan testified that it is a common practice for experts to share their measurements and photographs. Mr. Sullivan used these images, measurements, and observations—along with other evidence—to form his opinion. Additionally, Mr. Sullivan assessed the incident scene using bodycam and Ring doorbell videos of the incident, pictures taken immediately following the accident, and Google Earth images.

Defendants focus specifically on Mr. Sullivan's opinion that the gear shift showed "excessive lash," i.e., looseness, despite not personally measuring or quantifying the lash. Again, as Mr. Sullivan pointed out in his deposition and affidavit, he based this opinion on his field technician's documented measurements and demonstrative videos of the gear shift. Mr. Sullivan applied his technical knowledge of gear shifts—having repaired similar

issues in his career—to the facts provided by his field technician and other evidence in this case. The Court is satisfied that Mr. Sullivan's opinion regarding the condition of the gear shift is sufficiently reliable and relevant. Defendants' criticisms go to weight and credibility, not admissibility.

Next, Defendants challenge Mr. Sullivan's opinion that Budget failed to adequately preserve the vehicle as constituting a legal conclusion that is not based in fact. To the extent that Mr. Sullivan's opinion accuses Budget of spoilation, the Court agrees with Defendants. Mr. Sullivan may discuss the discrepancies in the condition of the vehicle between the time of the incident and when his field technician was able to inspect it and how this impacted his assessment and analysis. For example, he may testify that the additional 167 miles on the truck prevented him from being able to "assess *x* because *y*." He may also discuss the general standards and importance of chain of custody and related topics to forensic analysis to the extent he touches on this in his report. *See, e.g.*, Doc. 49-3, p. 6. However, he may not allege, opine, or draw a legal conclusion as to spoilation.

Lastly, Defendants object to Mr. Sullivan testifying that Budget violated the Clean Air Act, 42 U.S.C. § 7522, due to its use of an aftermarket catalytic converter.[5] Mr. Sullivan

---

[5] Plaintiff's response to this point is somewhat difficult to decipher, but it appears she did not substantively engage Defendants' argument:

> Defendants challenge this as a legal opinion on something that is not at issue. But applicable regulations prohibiting the disabling of a component of a vehicle's emission control system is relevant to this case. In his assessment of the facts and circumstances of this case, information available and applicable to Budget's fleet form part of the knowledge and notice that someone in Budget's position knew or should have known. Evidence of such knowledge has some tendency to make the fact that Budget knew, or should have known, that it should not permit the

did not test the catalytic converter, nor is he qualified to give a legal opinion. The only discernable argument here is: If Budget had recognized that this truck's catalytic converter violated the Clean Air Act and removed it from the rental fleet, then Conner would have been unable to rent this specific truck, and the subject injury may have been prevented—essentially "but for" causation. However, Plaintiff fails to argue, and the Court does not find, any proximate cause (i.e., how violating the Clean Air Act could foreseeably cause a truck to crush someone to death). Thus, this opinion would not aid the jury in determining liability or any issue of fact in this case, and Mr. Sullivan is barred from offering it.

For the foregoing reasons, the Court **GRANTS** Defendants' request to limit Mr. Sullivan's testimony but **DENIES** Defendants' request to exclude his testimony in full. Mr. Sullivan's testimony will be limited to the constraints discussed *supra*.[6]

### III. PLAINTIFF'S MOTION TO STRIKE SUMMARY JUDGMENT EVIDENCE

Plaintiff moves to strike all but one of Defendants' twelve summary judgment exhibits. Plaintiff first challenges several documents as lacking authentication because there is not an attached affidavit made on personal knowledge. Under the Federal Rules

---

malfunction indicator light to be permanently displayed and not addressed. That regulation is simply part of the basis for Mr. Sullivan's conclusion . . . .

(Doc. 49, p. 15).

[6] As to both experts, the Court's Order has used those opinions that were explicitly challenged by Defendants to articulate the appropriate boundaries of testimony. This, however, does not mean that all opinions offered in the reports not explicitly addressed by this Court are admissible. No part of Dr. Seal's or Mr. Sullivan's testimony may contravene the warnings of this Order—including, *inter alia*, going beyond one's area of expertise, speculating, or offering legal conclusions—or violate any other established limit on opinion testimony.

of Evidence and Eighth Circuit precedent, summary judgment evidence "must be authenticated by and attached to an affidavit made on personal knowledge setting forth such facts as would be admissible in evidence *or a deposition* that meets the requirements Fed. R. Civ. P. 56(e). Documents which do not meet those requirements cannot be considered." *Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1127 (8th Cir. 2017) (emphasis added) (quoting *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 635 n.20 (8th Cir. 2000)). Such depositions must provide "[t]estimony that an item is what it is claimed to be." Fed. R. Evid. 901(b)(1). Defendants have sufficiently authenticated their evidence through depositions. Doc. 60-6, p. 14 (authenticating Exhibit 1, Doc. 38-1); Doc. 60-12, pp. 5–7 (authenticating Exhibit 2, Doc. 38-2); Doc. 60-16, p. 7 (authenticating Exhibit 3, Doc. 38-3); Docs. 60-4 & 60-19 (authenticating and supplementing Exhibits 6, 7, and 11, Docs. 38-6, 38-7, 38-8, respectively); Docs. 38-5, p. 17 & 60-1, pp. 39–41 (authenticating Doc. 60-3, the later-filed Sheriff's Incident Report). The Court declines to strike any evidence on this basis.

Plaintiff tediously challenges several pieces of evidence as being inadmissible for various reasons, including hearsay, improper summary evidence, irrelevance, and pending objections made during depositions. Plaintiff, however, seems to overlook that "the standard is not whether the evidence at the summary judgment stage would be admissible at trial—it is whether it *could be* presented at trial in an admissible form." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (emphasis added) (citing Fed. R. Civ. P. 56(c)(2)). While Plaintiff has objected to the current form of the evidence, she has not shown why the underlying information "cannot be presented in a form that would be admissible in evidence" at trial. Fed. R. Civ. P. 56(c)(2). For example, much of

the evidence objected to as hearsay falls under Rule 803(6)'s business records exception, the alleged improper summary's contents are likely admissible through the proffered work order details (Docs. 60-9 & 60-11), and the deposition objections are mostly to form. To the extent Plaintiff challenges the content of the evidence in these objections, the Court has only relied on the evidence that could be presented in admissible form at trial. *See Gannon*, 684 F.3d at 793 (affirming the overruling of a hearsay objection at summary judgment because the nonmovant "does not even attempt to argue that the *information* contained in [the movant's] statement could not have been presented in an admissible form at trial" (emphasis added)). Accordingly, the Court will not strike this evidence.

Most perplexingly, Plaintiff asks the Court to strike all uncited portions of the following depositions: Neil Covey (Doc. 38-4), Conner Grummer (Doc. 38-5), Pete Sullivan (Doc. 38-8), Jordan Grummer (Doc. 38-9), and Dr. Dennis Seal (Doc. 38-12). Plaintiff's reasoning is that Fed. R. Civ. P. 56(c)(3) only *requires* a Court to review the *cited* materials. This request has no merit. The Rule clearly states that the Court "may consider other materials in the record," *id.*, and the Court does not see any reason to strike evidence from the record that is fully within its right to review. Thus, the Court declines to strike the uncited portions of these depositions.

Finally, Plaintiff's objections to unfiled or half-cited evidence have been cured. *See* Docs. 60-1, 60-3, 60, pp. 12–13. The Court declines to strike this evidence.

Where "a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," the Court is within its discretion to "give [that party] an opportunity to properly support or address the fact." Fed. R. Civ. P. 56(e). The Court does so here and finds that all of Plaintiff's objections are

either without merit or have been cured. Thus, Plaintiff's Motion to Strike Defendants' Summary Judgment Evidence is **DENIED**.

## IV. DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

In their Motion for Partial Summary Judgment, Defendants ask the Court to dismiss Plaintiff's claims for outrage and punitive damages and Plaintiff's theories of gross negligence and *res ipsa loquitor* as a matter of law.

### A.  Legal Standard

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Subpart (a) to Rule 56 provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In considering a motion for summary judgment, the Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that logically can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1998).

In order for there to be a genuine issue of material fact, the non-moving party must produce evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A factfinder can reasonably reach a conclusion if that conclusion is based on sufficient probative evidence and not on mere

speculation, conjecture, or fantasy." *Singleton v. Ark. Hous. Authorities Prop. & Cas. Self-Insured Fund, Inc.*, 934 F.3d 830, 835 (8th Cir. 2019) (internal quotations omitted).

### B.  Outrage

The tort of outrage requires a plaintiff to establish the following four elements:

(1) the actor intended to inflict emotional distress or knew or should have known that emotional distress was the likely result of his conduct; (2) the conduct was extreme and outrageous, was beyond all possible bounds of decency, and was utterly intolerable in a civilize community; (3) the actions of the defendant were the cause of the plaintiff's distress; and (4) the emotional distress sustained by the plaintiff was so severe that no reasonable person could be expected to endure it.

*McQuay v. Guntharp*, 331 Ark. 466, 470 (1998) (internal quotation marks omitted). Whether the tort of outrage is applicable to the facts of a case "must be determined on a case-by-case basis." *Id.* (citations omitted). Under Arkansas law, the tort of outrage is narrow, and "[m]erely describing the conduct as outrageous does not make it so." *Id.* at 471 (citations omitted). In determining whether conduct is extreme and outrageous, courts will consider the "period of time over which the conduct took place; the relation between plaintiff and defendant"—whether there was a relationship of trust or authority—"and defendant's knowledge that a plaintiff is peculiarly susceptible to emotional distress by reason of some physical or mental peculiarity." *Hamaker v. Ivy*, 51 F.3d 108, 111 (8th Cir. 1995); *see also* Howard W. Brill, Arkansas Law of Damages § 33:13 (5th ed. 2004).

Plaintiff contends that Defendants' behavior fits the tort of outrage because:

Defendants had an alternative available to them—lease Conner a vehicle that did not have a sloppy gear shifter or CEL illuminated. Yet, Defendants intentionally and/or with wanton disregard for the consequences of their actions choose [sic] the more dangerous route so that more vehicles would be available to lease to the public. The undisputable evidence demonstrates that Defendants intended to perform an act from which suffering should have been expected to result.

(Doc. 44, p. 17) (attempting to analogize the facts in the case at bar to *Growth Properties I v. Cannon*, 282 Ark. 472, 474 (1984), where the court held that it was outrageous for the owners of a cemetery to repeatedly roll heavy machinery over the plaintiffs' family's graves to the point that the vaults became exposed).

On the record before it, even when viewing all facts and making all inferences in Plaintiff's favor, Defendants' conduct was not "beyond all possible bounds of decency." *McQuay*, 331 Ark at 470. The conduct in the instant case is a question of diligence, not decency. Plaintiff cannot satisfy the elements for the tort of outrage, and the Court will dismiss Plaintiff's cause of action for outrage.

### C. Gross Negligence and Punitive Damages

Defendants move for summary judgment on both gross negligence and punitive damages. In addition to Plaintiff seeking punitive damages through her outrage claim (discussed in the previous section), she also seeks them through her negligence cause of action, which she states "rise[s] to the level of gross negligence as the term is defined in Ark. Code Ann. § 16-55-206," the statutory basis for punitive damages. (Doc. 2, p. 7). In her Response to the present Motion, Plaintiff cites four aspects of Defendants' conduct that justify punitive damages: (1) Defendants' failure to train the Coveys on critical safety issues; (2) Covey's decision to rent the vehicle with a loose gear shift; (3) Budget's unwritten policy authorizing renting vehicles with illuminated CELs; and (4) Defendants' alleged spoliation of the evidence.

Under Arkansas law, there is no independent cause of action for gross negligence or punitive damages, and "[n]egligence alone, however gross, is not sufficient to sustain" an award of punitive damages. *Diamond Shamrock Corp. v. Phillips*, 256 Ark. 886, 892

(1974). "Gross negligence without willfulness, wantonness, or conscious indifference does not justify infliction of punitive damages." *Id.*; *see also National Bank of Commerce v. McNeill Trucking Co. Inc.*, 309 Ark. 80, 88 (1992) (Dudley, J., concurring) (discussing line between gross negligence and wanton/willful conduct in the context of automobile accidents).

The Court declines to decide the applicability of punitive damages at this stage and will reserve its decision until trial.[7]

### D. *Res Ipsa Loquitor*

*Res ipsa* is an evidentiary doctrine that allows a jury to infer negligence in the absence of any specific proof of breach—that is, it shifts the burden from the plaintiff to prove negligence to the defendant to disprove negligence. For *res ipsa* to be applicable, four conditions must be met: (1) the defendant must owe a duty of due care to the plaintiff; (2) the accident must have been "caused by [a] thing or instrumentality under the control of the defendant"; (3) "the accident that caused the injury [must be] one that, in the ordinary course of things, would not occur if those having control and management of the instrumentality used proper care"; and (4) "there [must be] absence of evidence to the contrary." *Barker v. Clark*, 343 Ark. 8, 13–14 (2000). Additionally, the "instrumentality

---

[7] While the Court will reserve ruling for the time being, Plaintiff shall not mention or make any argument regarding punitive damages in the presence of the jury without first obtaining permission from the Court. Further, Plaintiff may not present evidence as to Defendants' financial condition for purposes of punitive damages until the Court has made a specific finding on the record that Plaintiff has established a prima facie case entitling her to an instruction on punitive damages.

causing injury [must] have been in defendant's exclusive possession and control up to the time of plaintiff's injury." *Id.* at 14.

Arkansas courts do not apply *res ipsa* "unless the event is the kind which ordinarily does not occur in the absence of negligence, and all other responsible causes, such as the conduct of the plaintiff or third persons are sufficiently eliminated." *Gann v. Parker*, 315 Ark. 107, 112 (1993). Further,

> The doctrine of *res ipsa loquitur* was developed to assist in the proof of negligence where the cause of an unusual happening connected with some instrumentality in the exclusive possession and control of the defendant could not be readily established by the plaintiff. The theory was that since the instrumentality was in the possession of the defendant, justice required that the defendant be compelled to offer an explanation of the event or be burdened with a presumption of negligence.

*Barker*, 343 Ark. at 14 (quoting *Reece v. Webster*, 221 Ark. 826, 829 (1953)).

In the instant case, the parties dispute whether the instrumentality that caused Mr. Grummer's death was in the exclusive control of Defendants, and, consequently, whether Plaintiff has sufficiently eliminated other possible causes. Defendants contend that, because the undisputed facts show that the truck was not under Defendants' physical control for approximately three days leading up to the accident and was driven from Colorado to Arkansas, there was clearly no exclusive control. Plaintiff argues that regardless of the physical distance between the truck and Defendants, the truck's *maintenance* remained under the exclusive control of the Defendants as evidenced by the rental agreement, which gave Defendants exclusive control over all maintenance decisions of the vehicle. (Doc. 44-29, p. 3).[8]

---

[8] Plaintiff's conception of the truck's *maintenance* as the instrumentality conflates the Defendants' duty and alleged breach with instrumentality. If the Court were to hold that the truck's maintenance was the instrumentality that caused the accident, it would

While the first element of *res ipsa* is met, as Defendants clearly had a duty to rent trucks that were reasonably safe and properly maintained, the crux of *res ipsa* is exclusivity of control in the context of an otherwise unexplainable set of circumstances—elements which are fundamentally missing here.

The Court agrees with Defendants that the injury-causing instrumentality was the truck, and that it was not in Defendants' exclusive control at the time of the accident. This is supported by the following undisputed facts: the truck had not been under Defendants' physical control for three days, (Doc. 2, pp. 3–4); Jordan had driven the truck from Colorado to Arkansas, *id.*; Conner's friend had driven and parked the truck while it was at his house, (Doc. 45, p. 13); immediately prior to the accident, Mr. Grummer was attempting to operate the vehicle (Doc. 60-1, pp. 32–33);[9] and, when the accident occurred, Mr. Grummer was running after the truck, *id.* at pp. 32–35.

Plaintiff attempts to analogize these facts to Arkansas cases where "*res ipsa* applied when the defendant was not present at the moment of injury, the injury occurred while the plaintiff was using the instrumentality, and the defendants maintained exclusive control over the inspection and maintenance of the injury causing instrumentality." (Doc. 44, p. 16); *see Marx v. Huron Little Rock*, 88 Ark. App. 284 (2004) (reversing the trial court's refusal to give a *res ipsa* instruction where an elderly woman was injured as she was sitting on the closed lid of the toilet in her hotel bathroom and the lid randomly

---

collapse the *res ipsa* analysis into ordinary negligence—i.e., whether the Defendants met their duty of properly maintaining the truck. This conflation is evidenced by Plaintiff's briefing, which points to Defendants' duty to maintain the vehicle as establishing exclusive control. *See* Doc. 44, p. 15.

[9] While Plaintiff disputes that Mr. Grummer was "operating the vehicle," she agrees that he exited the vehicle "after a failed *attempt* to operate" the vehicle. (Doc. 45, p. 16) (emphasis added).

27

detached causing her to fall onto the floor); *Fleming v. Wal-Mart, Inc.*, 268 Ark. 559, 570 (Ct. App. 1980) (holding that a third-party's opening and closing of cabinet doors on a display that subsequently fell on the plaintiff did not destroy the defendant store's exclusive control over the cabinets because the third-party's actions were foreseeable use).

However, unlike *Marx* and *Fleming*, the instrumentality in the instant case was no longer located at Defendants' business, but had been driven off the property, across state lines, and parked at Conner's friend's house over the course of three days. Additionally, the truck had been operated by Plaintiff's son and Conner's friend, and Mr. Grummer was attempting to operate the vehicle at the time of the accident. Here, unlike in *Fleming*, there is no "continuous eyewitness testimony" that "conclusively establishe[s] that no [one] . . . negligently handled the [truck] in the moments leading up to the accident." *See Dupont v. Fred's Stores of Tenn., Inc.*, 652 F.3d 878, 884 (8th Cir. 2011) (distinguishing similar facts in *Dupont* from *Fleming* on this basis and noting that federal courts are not bound by Arkansas intermediary courts). So, while "it could still be said that [the defendant in *Fleming*] had exclusive control of the cabinet when it fell, without intervening negligence . . . . [t]he same cannot be said here." *See id.* The case at bar is materially different than those cited by Plaintiff to support exclusive control, and Plaintiff has failed to create an issue of fact on this element.

The Court is similarly unconvinced that this is the type of accident that would not occur but for Defendants' negligence. To the contrary, the undisputed facts show that Mr. Grummer "got out of the truck," "bent down and looked inside the truck[,] and then, all of the sudden, the truck started rolling and he started running after it." (Doc. 60-1, pp. 32-

33). Unfortunately, it is entirely possible that this series of events could lead to injury or death even if the truck were functioning exactly as it should—that is, even "in the complete absence of negligence on the part of" Defendants. *Johnson v. M.S. Dev. Co., LLC*, 2011 Ark. App. 542, at *8 (2011) (holding "in the ordinary course of things . . . . it is very possible that . . . a person sitting with another person in an inner tube riding down a curvy waterslide[ ] could have fallen off the tube" even if the waterpark had not been negligent). The undisputed facts lend themselves to more than one theory of the accident—at least one of which could have occurred absent any negligence on the part of Defendants. Thus, Plaintiff has failed to meet her burden on this element.

Because Plaintiff cannot create a genuine issue of fact that the truck was under the exclusive control of the Defendants or that the accident could not have occurred but for Defendants' negligence, the Court will dismiss Plaintiff's theory of *res ipsa*.

\* \* \*

To summarize, Defendants' Motion for Partial Summary Judgment is **GRANTED** as to the tort of outrage and *res ipsa*, but it is **DENIED** as to punitive damages.[10]

---

[10] The Court considers any claim of gross negligence to fall within Plaintiff's claim for punitive damages, so the Court will not independently rule on summary judgment on gross negligence.

## V.  PLAINTIFF'S MOTION FOR SPOLIATION SANCTIONS

Plaintiff has moved for an adverse jury instruction to be given at trial as a sanction for Budget's alleged spoliation of the maintenance records and truck. Specifically, Plaintiff asks the Court to give the Arkansas Model Jury Instructions 106 and 106A.[11]

### A.  Legal Standard

Whether a court should impose the sanctions of an adverse inference jury instruction for spoliation is decided under federal law. *Sherman v. Rinchem Co., Inc.*, 687 F.3d 996, 1006 (8th Cir. 2012). Under Eighth Circuit precedent, a plaintiff must establish two elements to show they are entitled to an adverse inference instruction: intentionality and prejudice. *See Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 460 (8th Cir. 2013).

First, "there must be a finding of *intentional destruction* indicating a desire to suppress the truth." *Id*. (emphasis added) (quoting *Stevenson v. Union Pacific R.R. Co.*, 354 F.3d 739, 746, 748 (8th Cir. 2004)). The "ultimate focus for imposing sanctions for spoliation of evidence is intentional destruction," which is "rarely proved by direct evidence," thus "a district court has substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses . . . , and other factors." *Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) (internal quotations omitted) (citing *Morris v. Union Pac. R.R.*, 373 F.3d 896, 901, 902 (8th Cir. 2004)). Where the destruction occurs prior to the commencement of litigation,[12] the

---

[11] Note, the comment to AMI 106 specifically states that that Arkansas courts expressly rejected the Eighth Circuit's requirement of "intentional destruction *indicating a desire to suppress the truth*, i.e.," bad faith.  AMI 106, cmt. (emphasis added) (citing *Stevenson v. Union Pacific R.R. Co.*, 354 F.3d 739, 748 (8th Cir. 2004)).

[12] Plaintiff filed her complaint on August 30, 2022. By that point, the truck was at Budget's St. Louis storage facility on a legal hold. *See* Doc. 61-2, p. 11. There is no evidence that

court must make an explicit finding of bad faith before imposing an adverse inference instruction. *Hallmark Cards*, 703 F.3d at 461–62. The Eighth Circuit has stated:

> To be sure, a district court does not abuse its discretion by imposing sanctions, even absent an explicit bad faith finding, where a party destroys specifically requested evidence *after* litigation has commenced. However, where a court expressly finds . . . that there is no evidence of intentional destruction of evidence to suppress the truth, then the district court also acts within its discretionary limits by denying sanctions for spoliation of evidence.

*Gallagher v. Magner*, 619 F.3d 823, 844 (8th Cir. 2010) (first citing *Stevenson*, 354 F.3d at 749–50, then citing *Morris v. Union Pac. R.R.*, 373 F.3d 896, 901 (8th Cir. 2004)).[13]

Second, there must be some prejudice to the opposing party. *Hallmark Cards*, 703 F.3d at 460 (citing *Stevenson*, 354 F.3d at 748). "Prejudice requires finding that the evidence is both relevant and not available to the party through any other means." *Pioneer Civ. Constr., LLC v. Ingevity Arkansas, LLC*, 2023 WL 7413336, at *3 (W.D. Ark. Nov. 9, 2023) (citing *Koons v. Aventis Pharm., Inc.*, 367 F.3d 768, 780 (8th Cir. 2004) and *Greyhound Lines*, 485 F.3d at 1035). In determining prejudice, a court should assess whether the "allegedly harmed party took other available means to obtain the requested information." *Gallagher*, 619 F.3d at 844 (citation omitted).

---

any destruction occurred after this point. Thus, the applicable inquiry here is prelitigation spoliation.

[13] Although Budget likely knew litigation was imminent on July 26, 2022, when the letter of preservation was sent by Plaintiff's counsel, this Court will follow its sister court's recent interpretation of Eighth Circuit spoliation case law that intentionality and a finding of bad faith are required for prelitigation destruction, even where the party accused of destruction knew that litigation was likely imminent. *See Pioneer Civ. Constr., LLC v. Ingevity Arkansas, LLC*, 2023 WL 7413336 (W.D. Ark. Nov. 9, 2023); *see also id.* at *7 ("[I]ntent to suppress the truth, not [ ] mere knowledge of the possibility of litigation, is the key inquiry for [the] requested spoliation sanction[ ] [of an adverse jury instruction]." (citing *Greyhound Lines*, 485 F.3d at 1035)).

## B.  Maintenance Records

Budget uses an online system called Tomcat to log maintenance of its trucks. At initial disclosures, Budget produced the maintenance log in a spreadsheet along with the specific "work order details" that were logged into Tomcat. (Docs. 61-3, 60-9–60-11). Budget has since supplemented these records to include the towing of the vehicle following the accident. (Doc. 60-9, pp. 19 & 22). The work order details include the work order number, vehicle number, mileage, vendor name, cost, date, required labor and parts, condition of the vehicle and need for repair, and repair work done, among other information. *See, e.g.*, Doc. 60-9, pp. 1–5. Plaintiff argues that Budget's failure to retain and produce the original work orders and invoices from the third-party vendors amounts to spoliation. *See* Doc. 53, pp. 7–8.

The evidence shows that Budget retained and produced the original invoices from towing the truck after the accident, and these two towings of the truck are the only post-accident "work" done of which there is any evidence. (Doc. 60-9, pp. 19, 22). Prior to the accidence, Budget did not retain the original invoices and work orders, *see* Doc. 61-2, p. 8, and claims that its internal records on Tomcat contain identical information to the third-party invoices. (Doc. 61-1, p. 5). It is unclear how Plaintiff could claim that this evinces intentional destruction of evidence. Budget's routine document retention practices *before the accident* are not relevant here, and Budget retained and produced the original invoices post-accident. To the extent Plaintiff is trying to claim that Budget had other records of post-accident work that it intentionally destroyed, there is simply no basis for that. Thus, this cannot amount to spoliation.

Plaintiff also seems to argue that Budget's failure to acquire the original invoices from the third-party vendors amounts to spoliation. This argument has no merit. To start, there is no evidence that these documents have been destroyed, and they are very likely still retained by the third-party vendors. *See* Doc. 61-2, p. 8–9 (Budget's maintenance manager at its St. Louis facility, John Gierton, testifying that he believes Budget's policy was to require the third-party providers to keep the original work order and invoices for seven years). Without destruction, there can be no "*intentional destruction* indicating a desire to suppress the truth." *See Hallmark Cards*, 703 F.3d at 460 (emphasis added).

Further, there is no prejudice because Plaintiff did not "[take] other available means to obtain the requested information." *Gallagher*, 619 F.3d at 844. Budget provided Plaintiff with a log and work order details listing all third-party vendors, the relevant work they performed, and when they performed it. (Docs. 61-3; 60-9, 60-10, 60-11). Plaintiff could have pursued the original invoices herself by subpoenaing the vendors, or she could have moved to compel Defendants to acquire and produce these records, but she did not. *See Gallagher*, 619 F.3d at 844 (agreeing with the magistrate judge that, where the defendant had provided information to the plaintiff such that the plaintiff could subpoena third parties for the records but failed to do so, the "failure to pursue discovery [was] incongruent with [the] claim of prejudice"). Moreover, there is simply no evidence that there are unproduced documents that contain anything different than what exists in the already-produced internal records stored in Tomcat; this is solely Plaintiff's speculation.[14] Because there is

---

[14] Budget's Rule 30(b)(6) deponent, Daniel Scott Payne, stated that—even for third-party vendors that do not have access to Tomcat—any information notated on an invoice is inputted into Tomcat by Budget. (Doc. 60-6, pp. 36–37; Doc. 60-6, p. 13). The Court has not found any evidence that there are indeed relevant work orders/invoices for this truck that were not logged into Tomcat.

no evidence that the records in question were destroyed—let alone *intentionally* destroyed—or that there has been any prejudice to Plaintiff, sanctioning Budget for spoliation here is not appropriate.

### C. The Truck

Plaintiff's allegation of spoliation of the truck is best split into two categories: the general preservation of the truck following the accident and the unexplained and undisputed 167 miles that were driven on the truck between the July 2022 accident and the November 2022 inspection.

### 1. General Preservation of the Truck

Plaintiff attacks Budget's general preservation of the truck following the accident. Plaintiff specifically cites the following as evincing spoliation: (a) towing the truck; (b) unloading the truck; and (c) removing and reinstalling the drive shaft. Generally, the Court finds there is no evidence to show any of these acts resulted in spoliation and will address each below.

Plaintiff contends that Budget towing the truck (both from the scene of the accident to Conner's house and then from his house to the St. Louis storage facility) constitutes spoliation. Regarding the first towing, Budget argues that it—and its roadside service, Fleetnet—arranged with Conner's friend to tow the truck to his new home to assist him in his move following the accident. (Doc. 61-1, p. 8). Both Conner's testimony and Budget's maintenance summary show that the truck was towed July 25, the same day as the accident, and before the letter of preservation was sent. *See* Doc. 60-16, p. 15; Doc. 61-3, p. 1; Doc. 53-3, p. 1. Even for towing that occurred after the letter of preservation was sent, like the second towing, there is no evidence that it was done for any reason other

than to store the truck while it was on legal hold. "The ultimate focus for imposing sanctions for spoliation of evidence is the intentional destruction of evidence indicating a desire to suppress the truth, not the prospect of litigation," and there is no evidence that either towing was done in bad faith or to intentionally destroy evidence. *Greyhound Lines*, 485 F.3d at 1035 (citing *Morris*, 373 F.3d at 901); *see also Pioneer*, 2023 WL 7413336 at *7. Moreover, there is scant evidence,[15] if any, that towing the truck caused any material change in the condition of the truck, making it unlikely that Plaintiff was prejudiced.

Next, Plaintiff argues that unloading the truck constituted spoliation, reasoning that the weight and positioning of the load were relevant to the accident. Plaintiff, however, avoids the fact that the unloading of the truck occurred while it was in Conner's possession and was carried out by parties related to the Plaintiff—not Budget. *See* Doc. 60-16, pp. 15–16 (Conner stating in his deposition that his family and he—excluding his mother, Mrs. Grummer—unloaded the truck once they got to his new home in Bentonville after the accident); *see also id.* at p. 16 (Conner explaining that his friend then talked with Budget about Budget "reclaiming" the truck).

Plaintiff challenges the tow company's removal and reinstallation of the drive shaft as damaging the truck, resulting in spoliation of evidence. (Doc. 53, p. 7). The evidence presented to the Court, however, does not support this. Mr. Gierton explained that, to tow

---

[15] When asked by defense counsel whether towing the truck to Conner's materially impacted the evidence, Plaintiff's expert Pete Sullivan noted that the parking brake was possibly malfunctioning at the time of the accident in a way that it was no longer observed to malfunction during the inspection. (Doc. 41-2, p. 20). But he does not further explain how towing could have caused this change, absent speculation. When discussing material impacts on the evidence due to towing to St. Louis, he focuses on the unexplained 167 miles, which are discussed in the following subsection, rather than the actual act of towing. *Id.* at pp. 19–20.  He also admitted that it is not unusual for a vehicle involved in an accident to be "towed to intermediate storage locations." *Id.* at p. 19.

a truck like the one in this case without damaging the transmission, the towing company has to remove four bolts, "drop" the drive shaft, and tie it over to the side. (Doc. 61-2, p. 7). This is apparently standard protocol that was done both times the truck was towed (by two separate companies) to preserve the condition of the truck, and Plaintiff has not presented evidence to the contrary. Mr. Gierton—who has experience as a mechanic—testified that this process would not materially alter the condition of the truck. (Doc. 61-2, p. 7). Further, Plaintiff has provided no evidence to support that this interfered with her ability to inspect or assess the condition of the truck, and so has provided no evidence of prejudice.

### 2.  The Unexplained 167 Miles

Plaintiff's strongest argument for spoliation is the undisputed fact that, between the time of the accident and the time of inspection, the truck was somehow driven 167 miles. While there is some evidence to support prejudice here, there is no evidence of intentionality, and the most plausible explanation suggests nothing more than negligence.

Between the July 25, 2022 accident and the November 8, 2022 inspection, the vehicle's mileage accrued 167 miles. Plaintiff argues that this prejudiced her case by potentially causing some of the codes that may have been present at the time of the accident to move from "active" to "historical," meaning they would no longer be timestamped. *See* Doc. 44-18, p. 9 (Defendants' expert, Adam Michener, stating that historic codes cannot be pinpointed to a specific moment); Doc. 53-9, pp. 9–11 (Defendants' expert, Phil Smith, explaining that to capture the codes active at the time of

the accident you would want to run the diagnostic the next time you turn the vehicle on);[16] Doc. 53-8, pp. 3 (manual explaining that, for certain malfunctions, three cycles of driving may turn off the check engine light). While there is some merit, Plaintiff fails to provide any evidence that the 167 miles were put on the car intentionally to destroy the evidence.

Budget admits that it does not know how the additional miles ended up on the truck. It surmises that the company hired to tow the truck from Bentonville to St. Louis only towed the truck to Lebanon, Missouri—where their facility is located—then drove the truck from that facility to the Budget location in St. Louis.[17] Notably, Budget points out that the distance between these two locations is approximately 166 miles.[18] Budget clarifies, and the evidence supports, that it did not give instructions to drive the truck at any point. *See* Doc. 60-9, p. 21 (the work order detail regarding towing to St. Louis has no mention of driving, only towing); *id.* at p. 22 (the invoice for towing to St. Louis has no mention of driving, only towing); *see also* Doc. 60-6, pp. 9–10 (Mr. Payne, Budget's Rule 30(b)(6) deponent, stating he was not aware of any decision or instruction that the truck could be driven). Plaintiff has not raised any other plausible theory or evidence.

Budget's own evidence does suggest some degree of negligence as to the care and keeping of this truck, but negligence is insufficient to sustain an adverse inference

---

[16] Though it is not entirely clear what it would take to move the code to historic, the evidence suggests that the first person to turn the vehicle on after the accident was Conner's uncle when he was videoing the gear shift. If this were sufficient to clear the code, Plaintiff could not claim prejudice.

[17] Budget stated in its briefing that they contacted the towing company, and it did not recollect whether the truck was driven at any point.

[18] In its briefing, Budget notes that the truck was in the Grummers' possession for several days, there is a video of Conner's uncle family operating the vehicle, and it is unknown whether they drove it at all after the accident.

instruction. *See, e.g.*, *Sherman*, 687 F.3d at 1006 (affirming denial of spoliation sanctions where the plaintiff conceded that the defendant's destruction of notes was negligent). *C.f. Stevenson*, 354 F.3d at 747 ("We have never approved of giving an adverse inference instruction on the basis of prelitigation destruction of evidence through a routine document retention policy on the basis of negligence alone."). There is no evidence that Budget intentionally drove the truck to destroy evidence or the condition of the truck. And the Court could not reach such a conclusion without relying on several assumptions that are unsupported by evidence. Plaintiff bears the burden of showing spoliation and—without evidence of intentionality—Plaintiff cannot meet this burden. Accordingly, Plaintiff's Motion for Sanctions is **DENIED.**

### VI. CONCLUSION

Therefore, **IT IS ORDERED** that Defendants' Motion to Exclude and/or Limit Expert Testimony of Dr. Dennis Seal (Doc. 40) is **GRANTED IN PART AND DENIED IN PART**; Defendants' Motion to Exclude and/or Limit Expert Testimony of Pete Sullivan (Doc. 41) is **GRANTED IN PART AND DENIED IN PART**; Plaintiff's Motion to Strike Defendants' Summary Judgment Evidence (Doc. 42) is **DENIED**; Defendants' Motion for Partial Summary Judgment (Doc. 37) is **GRANTED IN PART AND DENIED IN PART**; and Plaintiff's Motion for Spoliation Sanctions (Doc. 53) is **DENIED**.

**IT IS SO ORDERED** on this 4th day of March, 2024.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE